John P. Gualtieri, J.
This is a claim for damages to claimants’ property arising out of the overflow of Fulmer Creek in the Village of Mohawk, Herkimer County, in January, 1962.
Fulmer Creek in said village is crossed by a bridge having two 34-foot spans with a center pier or abutment separating the two spans. It flows from south to north and empties into the Barge Canal approximately three fourths of a mile to the north of the bridge.
Prior to 1959 this bridge was owned by and under the control of the Town of German Flats. On March 18, 1959, the Superintendent of Public Works under the authority given him by section 230 of the Highway Law took over control of the bridge “for the purpose of repairing, altering or reconstructing the structure ’ ’.
In January, 1962, following a thaw and heavy rains, an ice jam was caused to accumulate at the southerly side of the bridge resulting in the overflow of the banks of the stream causing the *138 water to inundate the surrounding properties and damages to the claimants’ property as set forth in the claim. The evidence indicates that the frozen stream had started to break up several days prior to the evening of January 15 when the flooding conditions commenced; that the broken chunks of ice kept steadily rising until they completely blocked the two openings of the bridge.
This same condition had existed, on occasion, in the Village of Mohawk in Fulmer Creek for several years so that the responsible authorities had ample knowledge of the fact that unless the stream and the clearances under the bridge were properly maintained the banks of the stream would be caused to overflow and expose the surrounding areas to possible flooding and damage.
There is no problem for the court to find upon the evidence that this bridge and its existence over this creek formed a barrier which due to the accumulation of large chunks of ice forced the closing of the openings and the flood conditions which resulted. There is further no problem in finding from the evidence that whoever was responsible for safeguarding against this occurrence and preventing the flooding of the area had ample notice and knowledge that these conditions were likely to occur unless proper measures to prevent the damage were taken before an emergency status was reached.
In fact, by reason of the negligence of the responsible governmental unit, the conditions reached such an acute peak on the evening of January 15 and the flood damage was so extensive that the Governor of the State on January 18 was compelled to declare a state of emergency in the Village of Mohawk. There is no evidence in the record from which the court can conclude that weather conditions existing in this area at the time of and prior to the flood were unprecedented or that the flooding and damages resulting therefrom could be called an act of God.
The problem before the court is to determine whose responsibility it was to maintain the bed of the stream in the vicinity óf and under the bridge to avoid so far as possible the conditions that existed on the evening of January 15 when the flooding involved in this litigation occurred.
It is claimed on behalf of the State that it had no obligation whatsoever with reference to the stream channel; that the State under the provisions of the Highway Law simply took over the bridge structure and that its responsibility was solely to maintain and keep in repair the bridge structure itself and the surface approaches to the bridge along the highway.
The claimants on the other hand contend that by taking over the control of the structure in 1959 the State assumed the further *139 responsibility of seeing to it that this bridge over which it took control did not become an obstruction and that it had the responsibility of seeing to it that the clearances under the bridge remained open and unobstructed by debris, ice jams or other materials which prevented water to flow thereunder.
Prior to 1959 the local officials periodically inspected the bed of the stream in the vicinity of the bridge, excavated accumulated dirt and gravel so that both spans were open and unobstructed at all times. From the time the State took over the bridge in March of 1959, no one did anything with reference to maintenance in the channel in the vicinity of the bridge. The evidence shows there was caused to exist prior to this flood an accumulation of debris consisting of a large dead log in the easterly span; that gravel had been allowed to accumulate so that there was only a four-foot clearance in .the easterly span thus reducing the capacity of said opening and rendering it likely to be a source of potential danger when conditions such as those on January 15 and prior thereto occurred.
The question presented therefore is whether or not the State can take the position that under the provisions of the Highway Law its responsibility ends with maintaining the bridge structure and the highway surface and that it owed no duty whatsoever to keep the openings under said bridge clean and unobstructed.
We agree that the interpretation placed by the State upon subdivision 10 of section 230 of the Highway Law is probably correct. That section specifically provides that in connection with the construction of a new bridge the Superintendent of Public Works has some responsibility with reference to the stream channel. However, when the State took over this bridge it did so avowedly for the purpose of keeping it in repair as part of the State highway system and thereafter the bridge became part of the State highway. However, what is included in the definition of a highway is spelled out in subdivision 4 of section 2 of the Highway Law which defines a highway. That section provides that a highway ‘1 shall be deemed to include necessary sluices, drains, ditches, waterways ”.
The State knew that the reason for the bridge was in connection with Fulmer Creek, a waterway. When the State took the bridge over the bridge had available openings for the passage of water which we feel was its responsibility to keep available, open and clean .so that they would be useful and produce the results for which they were put there. On January 15 this bridge did not have the facilities for handling the water which it had when the State took it over by its directive of March 10, *140 1959. It had this responsibility and for its failure to discharge it, it must respond in damages to these claimants. (Taylor v. State of New York, 274 App. Div. 1021; Dreher v. State of New York, 281 App. Div. 925.)
Any other interpretation would place too narrow and limited a responsibility upon the State which in the promotion of its interest in State highways assumes control of a structure -such as this. The local officials, assuming that the State would properly discharge its responsibility did nothing after the State took -over the structure. The State did nothing in the vicinity of the bridge to safeguard the public against the flood conditions which resulted. Under the circumstances existing here we feel that any other holding would be unwarranted.
There is evidence in the record that local officials some time prior to the flood of January 15 had attempted by blasting operations in the creek to alleviate the situation. There is no evidence that any such measures were taken upstream or south of the bridge in an endeavor to prevent the crisis which was reached at the time of the flood. Also, it may well be, that had the local officials been alert to the conditions which were developing and had done something to prevent the large accumulations of ice jamming against the bridge that the flood conditions might have been prevented. Nevertheless, on the record before us we have concluded that it was the accumulation of the broken ice jamming the openings under the bridge and the abutments of the bridge, reaching such an elevation that they were on the south side of the bridge above the highway line that directly caused the damage to the claimants’ property. Whether or not there was concurring negligence on the part of anyone else we feel that the State was negligent in not providing free and unincumbered clearance under the bridge for the waters of Fulmer Creek. (Greeley v. State of New York, 94 App. Div. 605.)
We hold .therefore that from the time that the State of New York assumed responsibility for the bridge it assumed the concurrent responsibility of making sure that the bridge structure did not become a source -of danger and did not become an obstruction holding back the waters -of Fulmer Creek causing them to overflow and do the damage that has been established here.
Subdivision 2 of section 45 of the Highway Law authorizes the Superintendent of Public Works to enter the bed of a .stream ‘ ‘ to keep the waters of such streams or creeks within their proper channels and to prevent their encroachment upon state highways or bridges thereon ”. After taking over this bridge in 1959, it is the court’s holding that the State Department of *141 Public Works not only had the power but also the duty to reasonably keep the bridge spans open for the flowing waters of the stream. See Powell v. State of New York (284 App. Div. 1006) wherein the court in absolving the State of liability said that there was failure of proof that the bridge there involved “ had ever been taken over as part of the State’s highway system ”. This is not the situation here.
The State has attempted to define the limits of the State’s duties as those pertaining to an ordinary riparian owner and many of the State’s requests to find are predicated upon this theory. The court has refused to find as requested by the State. Whether or not in a broad sense the State becomes a riparian owner because of its ownership of a bridge or similar structure is academic. The State’s duties and obligations after taking over a bridge structure such as this are not those of an ordinary riparian owner, but are to be considered in the light of the decisions and provisions of the statutes hereinbefore referred to.
During the trial the claimants’ damage was stipulated to be in the sum of $4,125. It was further agreed by the parties that the court would make an award in addition to the stipulated amount for any depreciation of the claimants ’ property found to have occurred as a result of the flood. The evidence of permanent depreciation offered by the claimants is inconclusive and unsatisfactory and no award for this element is made herein.
It is the court’s determination that the State of New York was negligent; that the claimants were free from contributory negligence and that the claimants have been damaged in the sum of $4,125 for which amount judgment against the State of New York is hereby directed.